UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| EDWARD P. BLACKCLOUD, | ) | CIV. 10-5090-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RN MGR. MCLURE, | ) | |
| Mental Health Committee, | ) | |
| Classification Committee; | ) | ORDER GRANTING MOTIONS |
| SUPPORT LT. MCDONALD, | ) | FOR SUMMARY JUDGMENT |
| Mental Health Committee, | ) | |
| Classification Committee; | ) | |
| SECURITY LT. HAGA, | ) | |
| Mental Health Committee, | ) | |
| Classification Committee; | ) | |
| DICK LEIR, | ) | |
| Mental Health Committee, | ) | |
| Classification Committee; | ) | |
| COMMANDER GREER, | ) | |
| Classification Committee; | ) | |
| CPRL. YANTIS; | ) | |
| SGT. WEYGAERTS; | ) | |
| PREVITT; | ) | |
| BERKUM; and | ) | |
| DON HOLLOWAY, | ) | |
| Sheriff, Pennington County Jail, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Edward P. Blackcloud is an inmate at the Mike Durfee State

Prison in Springfield, South Dakota. On December 2, 2010, while

incarcerated at the Pennington County Jail, Mr. Blackcloud filed a pro se civil

rights lawsuit pursuant to 42 U.S.C. § 1983, claiming defendants[1] violated (1) the First and Fourteenth Amendments by retaliating against Mr. Blackcloud for exercising his right to free speech by denying him access to the grievance process, (2) the Sixth and Fourteenth Amendments by denying him access to counsel during a critical phase of his underlying criminal case, and (3) the Eighth and Fourteenth Amendments by inflicting cruel and unusual punishment against him when they consciously disregarded his objectively serious medical needs and placed him in administrative segregation without justification. (Dockets 1; 73).

On May 29, 2012, defendants Jodie McClure, Joe McDonald, Brooke Haga, Phillip Greer, Rob Yantis, John Weygaerts, David Prevett, Roy VanBerkum, and Don Holloway moved for summary judgment. (Docket 117). On June 1, 2012, defendant Dick Leir similarly moved for summary judgment. (Docket 128). Mr. Blackcloud opposes both motions. (Dockets 133; 139; 144). For the reasons set forth here, the court grants defendants' motions for summary judgment.

---

[1] In his June 25, 2012, reply to defendants' motions for summary judgment, Blackcloud insisted that Sherry Jackson be added to the list of defendants. (Docket 139). Sherry Jackson, however, was not listed in either the original or amended complaint, see Dockets 1; 73, and requesting such an addition in a reply to a motion for summary judgment does not comply with the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 15(a)(2). Sherry Jackson, therefore, is not a party to this lawsuit.

## BACKGROUND

Viewed in a light most favorable to Mr. Blackcloud, the nonmoving party, the facts are as follows:

Mr. Blackcloud was incarcerated at the Pennington County Jail ("PCJ") from June 17, 2010, to December 7, 2010, for the possession and sale of drugs and narcotics. (Dockets 119 at ¶¶ 1–2; 130 at ¶ 2). The PCJ provided inmates with mental health related services through a contract with Behavior Management Systems, Inc. (Dockets 130 at ¶ 3; 132 at ¶ 3; 132-1). Behavior Management Systems appointed Dick Leir[2] as the mental health case worker responsible for referring inmates' requests and grievances regarding mental health related services to the PCJ's mental health medical staff. (Dockets 119 at ¶ 10; 130 at ¶¶ 3, 5; 132 at ¶¶ 3–5; 132-1). If Mr. Leir believed an inmate should be evaluated by a medical professional, he would refer the inmate's request or grievance to the PCJ medical staff. (Docket 119 at ¶ 10). The medical staff was responsible for assessing the medical request or grievance and scheduling any appropriate appointments. (Dockets 119 at ¶ 20; 130 at ¶ 6; 132-2).

Personnel at PCJ maintain records of medical requests filed by each inmate within their facility. (Docket 119 at ¶ 5). Accordingly, PCJ has a

---

[2]Dick Leir has a master's degree in social work. (Docket 132 at ¶ 2). He cannot prescribe medications for mental health disorders or illnesses. Id.

record of Mr. Blackcloud's grievances as they relate to medical issues, several

of which were submitted along with the affidavit of Dick Lier.  See Docket

132.  Mr. Blackcloud similarly submitted copies of various medical requests

and grievances. (Docket 139).  From that evidence, it appears Mr. Blackcloud

submitted a volume of written medical requests and grievances during the

time period at issue.[3]  The following information details Mr. Blackcloud's

requests and grievances related to medical needs, along with PCJ's

corresponding actions:

   a.    Blackcloud submitted a sick call request on June 17, 2010,
         indicating he needed to discuss medication needs related to his
         prescription for asthma spray and Wellbutrin.  (Docket 139-1 at

---

[3]Blackcloud also provided copies of medical requests he submitted in
November 2006 and February 2007.  (Docket 139-1 at 9, 16–18).  That
documentation, however, will not be considered.  Not only did Blackcloud fail
to allege in his amended complaint that defendants violated his constitutional
rights in November 2006 and February 2007, but such actions are barred by
the applicable statute of limitations.  "Section 1983 contains no statute of
limitations, and no federal statute of limitations governs such actions."
Barkley v. Woodbury Cnty., Iowa, No. C 10-4106-MWB, 2012 WL 1889787, at
*8 (N.D. Iowa May 23, 2012) (citing Wilson v. Garcia, 471 U.S. 261, 280 (1985);
Board of Regents, Univ. of New York v. Tomanio, 446 U.S. 478, 484 (1980);
Carr v. Aubuchon, 969 F.2d 714, 716 (8th Cir. 1992)).  "When such a void in
federal statutory law occurs, federal courts have repeatedly 'borrowed' the state
laws governing an analogous cause of action."  Id. (citing Johnson v. Railway
Express Agency, Inc., 421 U.S. 454 (1975)).  "Thus, courts have applied the
personal injury statute of limitations of the state in which the court sits to
constitutional claims brought pursuant to § 1983."  Id. (citing Owens v. Okure,
488 U.S. 235, 236 (1989); Wilson, 471 U.S. at 280; Wycoff v. Menke, 773 F.2d
983, 984 (8th Cir. 1985)).  The statute of limitations on personal injury claims
in South Dakota is three years.  Robinson v. Ewalt, 808 N.W.2d 123, 127 (S.D.
2012).  Because Blackcloud filed his original complaint on December 2, 2010,
all § 1983 claims relating to events that occurred prior to December 2, 2007,
are barred by the applicable statute of limitations.

p. 10). A medical officer attempted to address the matter on June 18, 2010, but Blackcloud refused to be assessed at that time. Id.

b. Blackcloud submitted a sick call request on June 21, 2010, indicating he needed his asthma spray and Wellbutrin. (Docket 139-1 at p. 24). A nurse addressed the matter on June 22, 2010, by calling the Sioux San pharmacy. Id. The Sioux San pharmacy's records indicated Blackcloud's prescriptions had expired. Id. Consequently, Blackcloud needed to be re-examined at Sioux San to renew his prescriptions. Id.

c. Blackcloud submitted a sick call request on June 25, 2010, again indicating he needed asthma spray and Wellbutrin. (Docket 139-1 at p. 25). Blackcloud requested to speak with doctors at Sioux San. Id. A medical officer assessed Blackcloud that same day and provided him with an inhaler to relieve apparent wheezing. Id. At that time, the medical officer also advised Blackcloud to submit an inmate request to speak with Dick Leir about psych medications. Id.

d. Blackcloud submitted an inmate request on June 27, 2010, asking to see Dick Leir to discuss psych medications. (Docket 139-1 at p. 26). Leir saw Blackcloud on June 28, 2010, and referred his request to the medical staff at PCJ for purposes of scheduling any necessary appointments relevant to Blackcloud's request. (Dockets 130 at ¶ 9; 132-3). On June 27, 2010,[4] a nurse on the medical staff evaluated Blackcloud's request and decided not to refer the matter to a physician. (Docket 139-1 at p. 27).

e. Blackcloud had a medical appointment at Sioux San on July 9, 2010, during which time he had his chest x-rayed. (Docket 118-1 at pp. 23–24). The paperwork from that appointment indicates Blackcloud was to have a follow-up appointment with Dr. Evalina Murphy. Id.

f. Blackcloud submitted an inmate grievance form on August 23, 2010, requesting "mental health." (Docket 132-4). Leir evaluated

---

[4]The court is uncertain whether the nurse incorrectly transcribed the date or if Blackcloud was actually seen by the nurse prior to Dick Leir's referral. The order of events is immaterial.

Blackcloud that same day and referred Blackcloud's request to the medical staff at PCJ.  Id.  Leir also referred Blackcloud to the REBOUND Program.  Id.

g.    Blackcloud submitted an inmate grievance form on August 29, 2010, stating that, despite a federal court order requiring him to be on psych medications, PCJ had been denying treatment for two-and-one-half months.  (Docket 139-1 at p. 15).  Blackcloud requested to be taken to Sioux San for his psych medications to remedy the issue.  Id.  On August 31, 2010, Nurse McClure notified Blackcloud she checked with Sioux San records and was unable to find any psych medications listed under Blackcloud's name since June 2009.  Id.  Nurse McClure then asked Blackcloud if he had been filling prescriptions elsewhere so she could further research the issue.  Id.

h.    Blackcloud submitted an inmate grievance form on September 8, 2010, claiming he had been denied necessary medication for more than two months and requesting to be seen by the Sioux San Psych Department "ASAP."  (Docket 118-1 at p. 30).  Nurse McClure responded on September 10, 2010, reiterating she had checked on Blackcloud's prescriptions but the pharmacy at Sioux San had no prescriptions on file.  Id.  Nurse McClure also informed Blackcloud he had been put on the waiting list for an appointment at the Sioux San Medical Clinic.  Id.

i.    Blackcloud submitted a sick call request on October 18, 2010, requesting a bar of medical soap and asking to get an appointment with a doctor "ASAP."  (Docket 139-1 at p. 28).  On October 19, 2010, Nurse McClure notified Blackcloud his request was being evaluated by the mental health committee.[5]  Id.

---

[5]On September 14, 2010, PCJ notified its staff of a new mental health referral process that PCJ planned to implement for purposes of handling inmate requests for mental health related services.  (Dockets 132 at ¶ 10; 132-6).  In short, the new referral process was to proceed as follows: Dick Leir would continue to receive referrals from inmates, correctional staff, and medical staff.  (Docket 132-6).  Leir would then meet with inmates to assess their current mental health status and needs, and if further attention was required, Leir would either refer the inmate to the Mental Health Committee (in non-urgent cases), or recommend the inmate be seen within one week (in

j.    Blackcloud submitted sick call requests on October 20 and October 22, 2010, both times asking to see a psych doctor. (Dockets 132-6; 132-7). Leir received both requests on October 26, 2010, and met with Blackcloud that same day. (Docket 132 at ¶ 11). Leir referred Blackcloud to PCJ's mental health medical staff "STAT." (Docket 132-7). Blackcloud was seen by a physician's assistant at PCJ on November 8, 2010, and received a prescription for Wellbutrin to treat his depression and mood disorder. (Dockets 132 at ¶ 12; 132-8).

k.    Blackcloud submitted an inmate grievance form on October 28, 2010, stating he had asked Officer Previtt for his arthritis medication, but was told he would have to wait until the officers were not busy. (Docket 118-1 at p. 4). Blackcloud claimed he was being subjected to cruel and unusual punishment and noted he wanted to sue PCJ over the matter. Id. The officer on duty at that time noted he had spoken with Officer Previtt about the situation and Officer Previtt did not recall being asked for arthritis medication. Id. The officer on duty went on to state, "I know if you would have asked me or if you would have asked CO Previtt we would have gotten you your medications." Id. Lt. Haga responded to the grievance on October 30, 2010, disallowing further action and assuring Blackcloud that "officers do the best they can" and that Officer Previtt's actions did "not appear deliberate." Id.

l.    Blackcloud submitted an inmate request on November 9, 2010,[6] requesting the names of the individuals who serve on the Mental

---

urgent cases). Id. Leir's referrals would then be given to PCJ medical staff who were responsible for adding applicable health and medication information to the inmate's review form and for conducting a four-day observation of the inmate in question. Id. When medical staff completed their tasks, the inmate's mental health folder would get forwarded to the Mental Health Committee. Id. The Mental Health Committee would meet every Thursday to review referrals, and those inmates whose cases were deemed appropriate for further assessment would be scheduled for a mental health appointment based on urgency and availability. Id.

[6]The original date on this document actually reads "7-9-10," but was changed to "11-9-10." (Docket 139-1 at p. 29). Because this document was submitted by Blackcloud and he does not refute the date change, November 9, 2010, will be deemed the actual date on which the request was filed.

Health Committee. (Docket 139-1 at p. 29). He submitted an identical request on November 10, 2010. Id. Lt. Haga responded with the requested information on November 11, 2010. Id.

m.  Blackcloud submitted an inmate grievance form on November 10, 2010,[7] contending his medication was wrongfully crushed up and not given to him in original pill form as required by law. (Dockets 139-1 at p. 23; 118-1 at p. 8). To remedy the situation, Blackcloud asked to speak with his mental health doctor. Id. On November 11, 2010, Lt. McDonald responded to Blackcloud's grievance, disallowing further action and noting that he had just seen a physician's assistant on November 8, 2010. Id. McDonald also explained that "meds are crushed even in federal facilities." Id.

n.  Blackcloud submitted an inmate grievance form on November 11, 2010, again contending his medication was wrongfully crushed in an unclean cup. (Docket 118-1 at p. 31). Blackcloud claimed that such actions were never taken at the federal penitentiary. Id. Nurse McClure responded on November 15, 2010, noting that "[t]he handheld med crusher is used per manufacturer, tapped between pills." Id.

o.  Blackcloud submitted an inmate grievance form on November 12, 2010, stating his psych medications were again crushed, and the medical technician who crushed his medication "had put numerous of other people [sic] psych medications in same cup without cleaning it." (Docket 139-1 at p. 14). Blackcloud asserted that mixing narcotics violates federal law, as does crushing medications without a license to do so. Id. On November 15, 2010, Nurse McClure responded to Blackcloud's grievance, stating that Blackcloud's "medications [would] be crushed in the plastic sleeve with the hammer crusher." Id.

_____

[7]Again, the original date on this document actually reads "9-10-10," but was changed to "11-10-10." (Docket 139-1 at p. 23). Because this document was submitted by Blackcloud and he does not refute the date change, November 10, 2010, will be deemed the actual date on which the grievance was filed.

8

p.      Blackcloud submitted an additional inmate grievance form on November 12, 2010, alleging that the PCJ psychiatrist had refused to see him without a referral from Dick Leir. (Docket 139-1 at p. 34). Blackcloud noted that Leir had referred him numerous times, yet nothing happened. Id. Blackcloud requested "to be treated as a human being with a disability." Id. Blackcloud received a response on November 15, 2010, which informed him that the mental health clinic at Sioux San sees inmates every six weeks. Id. The response went on to note that Sioux San Hospital is given a list of PCJ inmates, and Sioux San Hospital ultimately chooses who they will see. Id. Blackcloud's "name was submitted in Oct. and S.San had put [him] on the waiting list." Id. The response then noted that Blackcloud had seen a physician's assistant on November 8, 2010, and was given a mental health medication at that time. Id.

q.      In a third inmate grievance filed on November 12, 2010, Blackcloud asked PCJ supervisors to provide him with a citation to the legal authority that allowed PCJ to refuse Blackcloud "full psych treatment for 5 months" and to crush his medications. (Docket 118-1 at p. 33). Nurse McClure responded on November 15, 2010, citing PCJ policy and referencing her response dated November 11, 2010. Id.

r.      Blackcloud was seen by a physician's assistant on November 12, 2010, for complaints of sores on his nose. (Docket 118-1 at p. 28). The physician's assistant diagnosed the issue as a nasal infection and prescribed appropriate ointment and medication. Id.

s.      Blackcloud submitted an inmate grievance form on November 19, 2010, alleging a medical technician, Berkum, gave him another inmate's medication. (Docket 118-1). Blackcloud requested that PCJ officials investigate the situation and issue a written and verbal apology to Blackcloud. Id. Blackcloud received a response from a PCJ supervisor on November 23, 2010, which stated medical staff had been notified of the mistake. Id. The medical staff confirmed Blackcloud would not experience any harm or ill effects as a result of taking that particular medication. Id. The supervisor assured Blackcloud the issue would be handled internally as a personnel matter. Id.

t.   Blackcloud submitted an inmate grievance form on November 20, 2010, again requesting his medications not be crushed by the medical technician who disperses medications.  (Docket 139-1).  To remedy the issue, Blackcloud requested an appointment with his "own doctor," Evalina Murphy.  Id.  Nurse McClure responded on November 22, 2010, and notified Blackcloud that he had been scheduled to be seen at the Sioux San Mental Health Clinic.  Id.  Blackcloud was seen by Dr. Murphy on November 29, 2010, at which time his previously prescribed Wellbutrin dosage was increased and his prescription for asthma spray was renewed.  (Docket 132-10).[8]

u.   Blackcloud submitted an inmate grievance form on December 3, 2010, again complaining about crushed medications and requesting that medical technicians refrain from crushing his medication.  (Docket 139-1).  Blackcloud further requested that the Mental Health Committee issue a verbal and written apology to Blackcloud.  Id.  Nurse McClure responded to Blackcloud on December 6, 2010, explaining that "meds are crushed with silent knight crusher, pouches are individual."  Id.

Mr. Blackcloud also alleges PCJ violated his constitutional rights by issuing disciplinary citations and placing him in administrative segregation to retaliate against him for the various grievances he had been filing.  (Docket 73 at ¶¶ 38–45).  Mr. Blackcloud and defendants submitted numerous documents relating to the disciplinary measures taken against Mr.

---

[8]On November 25, 2010, despite Blackcloud having been placed on the waiting list for an appointment at Sioux San Hospital, PCJ medical staff underwent a four-day observation.  (Docket 132 at ¶ 13).  During that time, the PCJ medical staff recorded Blackcloud's activity in 24-hour increments.  (Docket 132-9).  The medical staff did not observe any troublesome behavior during their four-day observation of Blackcloud.  (Docket 132 at ¶ 13).  On December 2, 2010, the Mental Health Committee reviewed the medical staff's observations, but because Blackcloud had already been seen and treated by Dr. Evalina Murphy at the Sioux San Hospital, the Medical Health Committee did not take any further action. (Docket 132 at ¶ 15).

Blackcloud during the time period at issue.  The following information

encompasses the correspondence related to disciplinary measures submitted

by the parties:

a.  Blackcloud submitted an inmate grievance form on October 23, 2010, complaining an officer denied him lunch and tore a picture of Blackcloud's fiancé off the wall of Blackcloud's jail cell. (Docket 118-1 at p. 2).  Blackcloud noted he believed he was being targeted by PCJ officers because he was preparing to file a lawsuit against PCJ for their denial of medical care to Blackcloud. Id.  The officer on duty at that time noted that "inmate Blackcloud was offered a lunch tray and told me 'I ain't eating that,' so I left the cell."  Id.  Sergeant Weygaerts responded to the grievance on October 24, 2010, disallowing further action and noting "when instructions are given you are expected to follow them without any dramatics on your part."  Id.

b.  Blackcloud submitted an additional grievance form on October 23, 2010, alleging three officers entered his cell, handcuffed him, and "completely destroyed [his] cell."  (Docket 118-1 at p. 3). Blackcloud noted that he believed such action was taken because he had been asking for his psych medication.  Id.  The officer on duty at that time noted that "[i]nmate Blackcloud's cell was thoroughly searched[,] his bedding was folded and place[d] back on his bunk."  Id.  "Proper care was taken and his cell was not 'completely destroyed.' "  Id.  Sergeant Weygaerts responded on October 24, 2010, disallowing further action and stating that "[a]ll cells are subject to search at any time."  Id.  "The cell was left in neat order."  Id.  "Your agitated behavior is what led to your being locked down."  Id.

c.  On October 25, 2010, Lt. Haga sent Blackcloud a letter to notify Blackcloud he was being put into administrative segregation. (Docket 118-1 at pp. 15–16).  In addition to listing Blackcloud's rights while in administrative segregation, the letter detailed the reasons Blackcloud was being placed in administrative segregation.  Id.  More specifically, the letter noted the following reasons:
    i.  On July 9, 2010, Blackcloud wrote a letter to another inmate stating he had assaulted someone in custody and

that Blackcloud was going to further injure him until he went on protective custody.  Id.

ii.     On October 1, 2010, Blackcloud was involved in the assault of another inmate.  Id.

iii.     On October 12, 2010, officials received reports that Blackcloud had been making unwanted sexual, racial, and vulgar comments toward other inmates.  Id.

iv.     On October 23, 2010, Blackcloud hindered a search of his cell. Blackcloud told the officer he had two choices—leave the contraband or put it in Blackcloud's property.  Id.

d.     Lt. Haga sent Blackcloud a letter on October 29, 2010, informing Blackcloud his classification had been reviewed and the classification committee determined Blackcloud would remain in administrative segregation. (Docket 118-1 at p. 17).  The letter also notified Blackcloud his next review was scheduled for November 5, 2010.  Id.

e.     Blackcloud submitted an inmate grievance form on November 1, 2010, contending he had been placed in administrative segregation even though he had committed no major rule violations. (Docket 118-1 at p. 7).  Blackcloud claimed all he ever wanted was to see a psychological doctor, and if the staff had allowed such an appointment, Blackcloud would not have ended up in administrative segregation.  Id.  To remedy the alleged wrong, Blackcloud requested to be released from administrative segregation, to be given an appointment with a psychological doctor, and to be allowed to grieve inmate rights without punishment.  Id.  Lt. Haga responded on November 2, 2010, disallowing further action and informing Blackcloud the Sheriff had received Blackcloud's appeal and Blackcloud needed to await a response.  Id.

f.     Lt. Haga sent Blackcloud a letter on November 5, 2010, informing Blackcloud his classification had been reviewed and the classification committee determined Blackcloud would remain in administrative segregation. (Docket 118-1 at p. 18).  The letter also notified Blackcloud his next review was scheduled for November 12, 2010.  Id.

g.     Lt. Haga sent Blackcloud a letter on November 12, 2010, informing Blackcloud his classification had been reviewed and

the classification committee determined that Blackcloud would remain in administrative segregation. (Docket 118-1 at p. 19). The letter also notified Blackcloud his next review was scheduled for November 19, 2010. Id.

h.      Lt. Haga sent Blackcloud a letter on November 19, 2010, informing Blackcloud his classification had been reviewed and the classification committee determined Blackcloud would remain in administrative segregation. (Docket 118-1 at p. 20). The letter also notified Blackcloud his next review was scheduled for November 24, 2010. Id.

i.      Lt. Haga sent Blackcloud a letter on November 24, 2010, informing Blackcloud his classification had been reviewed and the classification committee determined Blackcloud would remain in administrative segregation. (Docket 118-1 at p. 21). The letter also notified Blackcloud his next review was scheduled for December 3, 2010. Id.

j.      Blackcloud submitted an inmate grievance form on November 27, 2010, requesting a copy of Sgt. Paulin's report regarding Blackcloud's placement in administrative segregation and requesting a hearing on the grounds for his placement in administrative segregation. (Dockets 139-1 at p. 6; 118-1 at p. 10). Blackcloud received a response on November 29, 2010, which explained that Blackcloud was in administrative segregation "due to several disciplinary lock downs and a physical altercation on 10-1-10 in which [Blackcloud] assaulted an inmate." (Dockets 139-1 at p. 6; 118-1 at p. 10). The response went on to explain that Blackcloud was in administrative segregation because he was "deceptive over medical care." (Dockets 139-1 at p. 6; 118-1 at p. 10).

k.      Lt. Haga sent Blackcloud a letter on December 3, 2010, informing Blackcloud his classification had been reviewed and the classification committee determined Blackcloud would remain in administrative segregation. (Docket 118-1 at p. 22). The letter also notified Blackcloud his next review was scheduled for December 10, 2010. Id.

Mr. Blackcloud was released from PCJ on December 7, 2010.  (Docket 130 at ¶ 22).  Before his release, Blackcloud filed the § 1983 lawsuit that is now before the court on defendants' motions for summary judgment.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence,[9] viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law."  Clark v. Kellog, Co., 205 F.3d 1079, 1082 (8th Cir. 2000); *see also* Fed. R. Civ. P. 56(a).  "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and by affidavit or otherwise designate specific facts showing that there is a genuine issue for trial." Commercial Union Ins. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992) (internal quotations and citations omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although "the court is required to . . . give [the nonmoving] party the benefit of all reasonable inferences to be drawn from the underlying facts," Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077

---

[9]Included within the evidence are the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.  Fed. R. Civ. P. 56(c).

(8th Cir. 1980), the nonmoving party may not "rest upon mere denials or allegations." Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002). Instead, the nonmoving party must "set forth specific facts sufficient to raise a genuine issue for trial." Id.

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. Quam v. Minnehaha Cnty. Jail, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Fed. R. Civ. P. 56 remains applicable to prisoners proceeding pro se. Id. The district court is not required to "plumb the record in order to find a genuine issue of material fact." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). Moreover, the court is not "required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Id. Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980).

## DISCUSSION

Defendants submitted separate motions for summary judgment. (Dockets 117; 129). The court will address each motion separately.

## I.    PENNINGTON COUNTY DEFENDANTS

On May 29, 2012, defendants Jodie McClure, Joe McDonald, Brooke Haga, Phillip Greer, Rob Yantis, John Weygaerts, David Prevett, Roy VanBerkum, and Don Holloway ("Pennington County Defendants") filed a motion for summary judgment. (Docket 120). The Pennington County Defendants assert they are entitled to qualified immunity and should be granted judgment as a matter of law because they did not clearly violate Mr. Blackcloud's constitutional rights. (Docket 120 at p. 2). More specifically, the Pennington County Defendants claim they (1) did not act with deliberate indifference toward a serious medical need, (2) did not deny Mr. Blackcloud's grievances based on his race, (3) did not place Mr. Blackcloud in administrative segregation based on his race or medical requests, and (4) did not violate the Equal Protection Clause of the Fourteenth Amendment.[10]

---

[10]In their memorandum in support of the motion for summary judgment (Docket 120 at p. 2), the Pennington County Defendants appear to suggest Blackcloud has abandoned the claims set forth in his amended complaint. (Docket 73). It is not clear from Blackcloud's deposition, however, that he intended to abandon his original claims in favor of the three claims set forth in the Pennington County Defendants' memorandum in support of the motion for summary judgment. (Docket 120 at p. 2). Because the court must resolve all inferences in favor of the nonmoving party, the court cannot conclude Blackcloud abandoned the well-pleaded allegations of his amended complaint. In other words, the court does not accept the Pennington County Defendants' recharacterization of Blackcloud's claims; the court does not agree that Blackcloud is alleging that his First and Eighth Amendment rights were violated "only because he is a Native American." (Docket 120 at p. 2). Accordingly, the court will address the Pennington County Defendants' arguments in light of Blackcloud's original claims as presented in his amended complaint. (Docket 73).

Mr. Blackcloud responded to the Pennington County Defendants'
motion for summary judgment on June 5, 2012, and again on June 25, 2012.
(Docket 133; 139).  In his initial response, Mr. Blackcloud takes issue with
the use of his deposition testimony, which he claims he never reviewed or
signed. (Docket 133).  Moreover, Mr. Blackcloud asserts his deposition cannot
be relied upon because it was submitted to the court after the discovery
deadline.[11]  Id.  In his second response, Blackcloud asserts the Pennington
County Defendants did, in fact, know about Blackcloud's mental health
condition but still failed to provide adequate medical treatment.  (Docket 139).
Mr. Blackcloud goes on to assert the Pennington County Defendants
committed medical malpractice in determining, via the Mental Health

---

[11]Blackcloud's arguments related to the admissibility of his deposition
transcript must fail.  First, pursuant to Fed. R. Civ. P. 30(e), a deponent has
thirty (30) days after notice that the transcript is available to review the
transcript and submit a signed statement proposing specific modifications and
explaining the grounds for such modifications.  Failure to submit proposed
changes within the thirty days provided by Rule 30(e) results in a waiver of a
deponent's right to modify his deposition transcript.  To this day, more than
ten months after Blackcloud's deposition transcript was made available (Docket
143-1), more than three months after Blackcloud was provided with the
portions of the deposition that were used in support of defendants' motions for
summary judgment (Docket 111-1), and more than thirty days after Blackcloud
was supplied with the entire deposition transcript, Blackcloud has yet to
identify the portions of the transcript with which he disagrees.  Consequently,
he has waived his right to contest any portion of his deposition transcript.  See
also Green v. Louisiana, No. Civ. A 99-1606, 2001 WL 474280, at *3 (E.D. La.
May 3, 2001) (stating that the plaintiff "waived his right to make any
corrections in the transcript by not submitting them with his opposition to the
motion for summary judgment").  Second, Blackcloud's deposition was taken
on November 22, 2011, approximately ten days prior to the close of discovery
on December 1, 2011, (Docket 68 at p. 2) and remains admissible.

Committee, which inmates would receive medical treatment.  Id.  For the

reasons set forth below, the Pennington County Defendants' motion for

summary judgment is granted.

**A.    The Pennington County Defendants, in Their Official Capacities, Did Not Deprive Blackcloud of His Constitutional Rights.**

Mr. Blackcloud appears to bring a § 1983 action against the Pennington

County Defendants in their official and individual capacities. (Docket 73 at

¶¶ 60–61).  Insofar as Mr. Blackcloud alleges the Pennington County

Defendants violated his constitutional rights in their official capacities, the

court finds the § 1983 suit is actually a suit against Pennington County.  See

Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (stating that a suit against

a public official in his/her official capacity is actually a suit against the entity

for which the public official is an agent).

"In general, 'a local government may not be sued under § 1983 for an

injury inflicted solely by its employees or agents' on a respondeat superior

theory of liability."  Parrish, 594 F.3d at 997 (citing Monnell v. New York Dep't

of Soc. Servs., 436 U.S. 658, 694 (1978)).  To impose § 1983 liability on a

local government body, a plaintiff must show that an official policy or

widespread practice caused a deprivation of a constitutional right.  Monnell,

436 U.S. at 690–91.  Mr. Blackcloud has neither alleged nor demonstrated

that an official policy or widespread practice violated his constitutional rights.

Accordingly, Mr. Blackcloud's § 1983 action against the Pennington County Defendants in their official capacities is dismissed.

## B. The Pennington County Defendants Are Entitled to Qualified Immunity in Their Individual Capacities Insofar As Their Conduct Did Not Violate Blackcloud's Clearly Established Constitutional Rights.

With respect to Mr. Blackcloud's § 1983 action against the Pennington County Defendants in their individual capacities, qualified immunity will function to protect those defendants whose actions were objectively reasonable in light of clearly established constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (" 'The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.' " (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991))). To determine whether the Pennington County Defendants are entitled to qualified immunity, the court will address each of Mr. Blackcloud's constitutional claims as set forth in the Pennington County Defendants' brief in support of motion for summary judgment. (Docket 120). "If the answer [to whether a constitutional right was violated] is no, we grant qualified immunity," and enter summary judgment in favor of the Pennington County Defendants. Grayson v. Ross, 454 F.3d 802, 808–09 (8th Cir. 2006).

**1.    The Pennington County Defendants are entitled to summary judgment on Blackcloud's retaliation claim.**

The Pennington County Defendants assert they did not retaliate against Mr. Blackcloud for his participation in the grievance process when they placed him in administrative segregation.  Rather, the Pennington County Defendants put Blackcloud in administrative segregation "because he presented a substantial risk to the security or order of the institution or to the safety or [sic] others on multiple occasions."  (Docket 120 at p. 9).  The Pennington County Defendants assert they did not engage in retaliatory discipline.  (Docket 120).  In his reply, Mr. Blackcloud did not contest the facts upon which the Pennington County Defendants based their assertion.

"A prima facie case of retaliatory discipline requires a showing that: (1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline."  Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009) (quoting Meuir v. Greene Cnty. Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007)).  It is undisputed that Mr. Blackcloud satisfied the first two elements of the prima facie case.

First, the record establishes Mr. Blackcloud filed a number of grievances related to medical care between June 2010 and December 2010, and the law is well-settled that filing a grievance is a constitutionally

protected First Amendment activity.  Lewis v. Jacks, 486 F.3d 1025, 1029

(8th Cir. 2007).  The record also establishes the Pennington County

Defendants disciplined Mr. Blackcloud—prison officials filed disciplinary

citations and Blackcloud was eventually placed in administrative segregation.

See Haynes, 588 F.3d at 1156 (stating that, regardless whether reclassifying

an inmate or moving the inmate to a different cell constitutes "discipline," the

very filing of a disciplinary charge amounts to discipline that "'is actionable

under section 1983 if done in retaliation.' " (quoting Sprouse v. Babcock, 870

F.2d 450, 452 (8th Cir. 1989))).

At dispute is whether Mr. Blackcloud's exercise of his First Amendment

rights was the motivation for his disciplinary citations and eventual

placement in administrative segregation.  See Haynes, 588 F.3d at 1156

("[T]he filing of a disciplinary charge . . . is actionable under section 1983 if

done in retaliation for [the inmate's] having filed a grievance pursuant to

established procedures.").  "[I]f the alleged retaliatory conduct violations were

issued for the actual violation of a prison rule," Blackcloud's retaliation claim

fails. Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008); see also

Haynes, 588 F.3d at 1156 ("To establish the third element of the prima facie

case for retaliatory discipline, that exercising the protected right motivated

the discipline, an inmate must show that but for a retaliatory motive the

prison official would not have filed the disciplinary report.").  "Thus, a

defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." <u>Hartsfield</u>, 511 F.3d at 829 (citation omitted).

Here, the Pennington County Defendants provided evidence demonstrating Mr. Blackcloud was placed in administrative segregation after a series of rule violations over the course of three months. (Docket 118 at ¶ 20). Mr. Blackcloud wrote a threatening letter to an inmate, assaulted an inmate, directed unwanted sexual, racist, and vulgar comments at other inmates, and hindered a search of his cell. <u>Id.</u> Mr. Blackcloud has not contested these facts, and therefore has not established that, but for a retaliatory motive, prison officials would not have filed disciplinary citations and placed him in administrative segregation. The court concludes the Pennington County Defendants did not violate Mr. Blackcloud's constitutional rights and are thus granted qualified immunity on these issues. Accordingly, the Pennington County Defendants are entitled to summary judgment on Mr. Blackcloud's retaliation claim.

**2. The Pennington County Defendants are entitled to summary judgment on Blackcloud's claim that denial of access to the grievance process violated his constitutional rights.**

The Pennington County Defendants assert they did not deny Mr. Blackcloud access to the grievance process based on his race. (Docket 120). The Pennington County Defendants represent they responded to each of Mr.

Blackcloud's grievances without once making reference to his race.  Id.  In his reply to the Pennington County Defendants' motion for summary judgment, Mr. Blackcloud did not dispute this assertion.

Prisoners have a constitutional right to seek redress of grievances as part of their right of access to courts.  That constitutional right, however, is not compromised by the mere denial of grievances so long as the prisoner has "not allege[d] that he was prohibited from filing grievances altogether." Lomholt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002) (citations omitted). Significantly, at his deposition, Blackcloud conceded the defendants never prohibited him from filing a grievance.  (Blackcloud Dep. 25:23–26:1; 30:23–31:1, Nov. 22, 2011).

Nonetheless, during his deposition, Mr. Blackcloud alleged his grievances were denied in violation of the equal protection clause of the Fourteenth Amendment.  To sustain a claim under the equal protection clause, Mr. Blackcloud must show either he was a member of a protected class and a fundamental right was violated, or that " 'similarly situated classes of inmates [were] treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest.' " Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003) (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998)).  Further, Mr. Blackcloud must show the Pennington County Defendants intentionally or purposefully

discriminated against him on account of his race in their denial of his various requests. Lewis, 486 F.3d at 1028. "Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated inmates were treated differently." Id.

Blackcloud presented insufficient evidence to establish any of the elements of an equal protection claim. Mr. Blackcloud states he is Native American, but he does not indicate which fundamental right was violated by the Pennington County Defendants when they denied a portion of his grievances and requests.[12] Further, he does not allege the Pennington County Defendants intentionally or purposefully discriminated against him on account of his race, nor does he provide evidence that similarly situated inmates were treated differently. In fact, Mr. Blackcloud even admits to having no actual evidence of discrimination–he just assumes he was denied medical requests because of his race. (Blackcloud Dep. 41:7–16).

In the absence of any evidence demonstrating discriminatory intent or treatment, the court concludes the Pennington County Defendants have not

---

[12]As previously stated, although filing a grievance is a constitutionally protected First Amendment activity, Lewis, 486 F.3d at 1029, there is no constitutional right to have your grievances addressed, Lomholt, 287 F.3d at 684. As Blackcloud repeatedly conceded in his deposition, he was never denied access to the grievance process. (Blackcloud Dep. 25:23–26:1, 30:18–31:1). He was simply disappointed when his grievances were denied. (Blackcloud Dep. 26:2–4).

violated Blackcloud's constitutional rights and are granted qualified immunity

on these issues. Accordingly, the Pennington County Defendants are entitled

to summary judgment on Blackcloud's claims regarding denial of access to

the grievance process.

### 3. The Pennington County Defendants are entitled to summary judgment on Blackcloud's claim for inadequate medical care.

The Pennington County Defendants assert they did not act with

deliberate indifference toward Mr. Blackcloud's serious medical needs and did

not violate the Eighth Amendment's protection against cruel and unusual

punishment. (Docket 120). In his reply, Mr. Blackcloud argues that the

Pennington County Defendants were aware of his mental health condition, yet

failed to provide appropriate treatment. (Docket 139).

"To prevail on an Eighth Amendment claim, an inmate must show both

an objective element, that the deprivation was sufficiently serious, and a

subjective element, that the defendant acted with a sufficiently culpable state

of mind." Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997) (citations

omitted). "In a deprivation of medical care case, an inmate must show that

the prison official was deliberately indifferent to the inmate's serious medical

needs." Id. (citing Camberos v. Branstad, 73 F.3d 174, 175 (8th Cir. 1995)).

"A serious medical need is 'one that has been diagnosed by a physician as

requiring treatment, or one that is so obvious that even a layperson would

easily recognize the necessity for a doctor's attention.' "[13]  <u>Coleman</u>, 114 F.3d at 784 (quoting <u>Camberos</u>, 73 F.3d at 176)).  "The determination whether a medical need is sufficiently obvious" requires an analysis of "[t]he prison officials' background knowledge."  <u>Jones v. Minn. Dep't of Corr.</u>, 512 F.3d 478, 482 (8th Cir. 2008).  "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.' "  <u>Coleman</u>, 114 F.3d at 784 (quoting <u>Crowley v. Hedgepeth</u>, 109 F.3d 500, 502 (8th Cir. 1997)).

To establish deliberate indifference, an inmate must demonstrate that a prison official knew the "inmate face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."  <u>Coleman</u>, 114 F.3d at 785 (citing <u>Farmer v. Brennen</u>, 511 U.S. 825, 847 (1994)).  " '[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's

---

[13]The United States Court of Appeals for the Eighth Circuit determined the following circumstances exhibit a serious medical condition: a pregnant inmate who is bleeding and passing blood clots, <u>see</u> <u>Pool v. Sebastian Cnty., Ark.</u>, 418 F.3d 934, 945 (8th Cir. 2005); an inmate who is complaining of extreme tooth pain and presenting with swollen, bleeding gums, <u>see</u> <u>Hartsfield v. Colburn</u>, 371 F.3d 454, 457 (8th Cir. 2004); and a diabetic inmate who is experiencing excessive urination, diarrhea, sweating, weight loss, and dehydration, <u>see</u> <u>Roberson v. Bradshaw</u>, 198 F.3d 645, 647–48 (8th Cir. 1999). <u>Jones v. Minn. Dep't of Corr.</u>, 512 F.3d 478, 482 (8th Cir. 2008).

health and then failed to act on that knowledge.' " Id. (citing Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)).

Mr. Blackcloud established neither a serious medical need nor deliberate indifference toward that medical need. First, Mr. Blackcloud failed to submit any evidence demonstrating he has been diagnosed by a physician with a serious medical condition that requires treatment. See Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994) (noting a prisoner's bare assertion of a self-diagnosis is insufficient to establish the existence of a serious medical need). Although Mr. Blackcloud alleges he had been prescribed certain medications, Nurse McClure reviewed his records and discovered his prescriptions expired in 2009. (Docket 120).

Since Mr. Blackcloud has not presented facts to suggest his medical condition had been diagnosed as requiring treatment, we must determine whether his medical need was so obvious that even a layperson would easily recognize the necessity for a doctor's attention. The court concludes it was not. The only evidence Mr. Blackcloud provided to demonstrate his objectively serious medical need are his persistent requests for treatment, none of which cite to his actual physical condition. Furthermore, Mr. Blackcloud does not allege the delay in treatment adversely affected his medical condition. Because a reasonable person would not have easily concluded, based on Mr. Blackcloud's requests and the information provided

that his condition required treatment, Mr. Blackcloud failed to establish the existence of a serious medical need.

But even if Mr. Blackcloud's alleged medical needs were objectively serious, he failed to demonstrate the Pennington County Defendants acted with deliberate indifference toward his serious medical needs—that they both knew about and disregarded his medical needs.  As the grievance forms and inmate requests demonstrate, each time Mr. Blackcloud issued a request, the Pennington County Defendants reviewed the matter and promptly responded.  On various occasions, Mr. Blackcloud was seen by a nurse or a physician, and when medical personnel thought it was necessary, he was prescribed appropriate medications.[14]  In other words, the Pennington County Defendants, when aware of an actual medical need, acted on that knowledge.  Since this conduct would fail to satisfy even the negligence standard, it certainly does not rise to the level of deliberate indifference.  See Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995) ("The prisoner must show more than negligence, more even than gross negligence, and mere

---

[14]To the extent Blackcloud argues the medical attention he received was inadequate, the court would still find no evidence of deliberate indifference.  See Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) (noting that "an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment"); Davis v. Hall, 992 F.2d 151, 153 (8th Cir. 1993) ("Disagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs.").  Furthermore, even if the course of treatment was inadequate, "mere negligence or medical malpractice . . . are insufficient to rise to a constitutional violation" under the Eighth Amendment.  Dulany, 132 F.3d at 1239.

disagreement with treatment decisions does not rise to the level of a constitutional violation.").  Therefore, Mr. Blackcloud failed to establish the Pennington County Defendants acted with deliberate indifference toward his medical needs.

Because Mr. Blackcloud presented no genuine issue of material fact regarding his access to medical care, the court concludes the Pennington County Defendants have not violated Mr. Blackcloud's constitutional right and are granted qualified immunity on this issue.  Accordingly, the Pennington County Defendants are entitled to summary judgment on Mr. Blackcloud's Eighth Amendment claim for inadequate medical care.

    **4.    The Pennington County Defendants are entitled to summary judgment on Blackcloud's claim that placement in administrative segregation violated his due process rights under the Fourteenth Amendment.**

The Pennington County Defendants assert they did not violate Mr. Blackcloud's due process rights by placing him in administrative segregation. More specifically, the Pennington County Defendants allege Mr. Blackcloud's placement in administrative segregation did not violate a liberty interest protected by the due process clause of the Fourteenth Amendment.  In his reply to the Pennington County Defendants' motion for summary judgment, Mr. Blackcloud does not dispute this assertion.

"In the [administrative segregation] context, the determination of whether prison officials have denied an inmate due process involves a two-

step inquiry." Williams v. Hobbs, 662 F.3d 994, 1000 (8th Cir. 2011). First,

an inmate "must first demonstrate that he was deprived of life, liberty, or

property by government action." Phillips, 320 F.3d at 846. "To prevail on

such a claim based on prison housing, an inmate must show that the

segregation created an 'atypical and significant hardship on him in relation to

the ordinary incidents of prison life.' " Williams, 662 F.3d at 1000 (quoting

Rahman X v. Morgan, 300 F.3d 970, 973 (8th Cir. 2002) (quoting Sandin v.

Conner, 515 U.S. 472, 484 (1995))). Notably, an inmate does not have a

liberty interest in the procedures by which he is placed in segregation. See

Phillips, 320 F.3d at 847 ("[A]ny liberty interest must be an interest in the

nature of the prisoner's confinement, 'not an interest in the procedures by

which the state believes it can best determine how [a prisoner] should be

confined.' " (quoting Kennedy v. Blankenship, 100 F.3d 640, 643 (8th Cir.

1996))). Second, if there is a life, liberty, or property issue at stake, the court

" 'must next determine what process is necessary to protect that interest.' "

Williams, 662 F.3d at 1001 (quoting Clark v. Brewer, 776 F.2d 226, 232 (8th

Cir. 1985)).

As the Pennington County Defendants have articulated, the Eighth

Circuit repeatedly has held administrative or disciplinary segregation does not

constitute an atypical and significant hardship in and of itself. See Phillips,

320 F.3d at 847 ("We have consistently held that a demotion to segregation,

even without cause, is not itself an atypical and significant hardship." (citing Kennedy, 100 F.3d at 642)). To assert a liberty interest, Mr. Blackcloud "must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." Id.

Mr. Blackcloud presented no evidence to suggest the differences between his conditions in segregation and the conditions in the general population amounted to an atypical and significant hardship. Therefore, the court concludes the Pennington County Defendants have not violated Mr. Blackcloud's constitutional right and are granted qualified immunity on this issue. Accordingly, the Pennington County Defendants are entitled to summary judgment on Blackcloud's Fourteenth Amendment claim that his placement in administrative segregation violated due process.

> **5. The Pennington County Defendants are entitled to summary judgment on Blackcloud's Sixth and Fourteenth Amendment claims for denial of access to counsel.**

The Pennington County Defendants moved for summary judgment on all claims asserted by Mr. Blackcloud in his amended complaint. (Docket 117). Those claims include an allegation defendants violated Mr. Blackcloud's right to access to counsel in violation of the Sixth and Fourteenth Amendments and § 1983. (Docket 73, ¶¶ 27 & 47-50). Defendants' statement of undisputed material facts establishes Mr. Blackcloud does not

know why he was denied access to counsel at the Pennington County Jail the day before he entered a guilty plea in the underlying criminal case. (Docket 119, ¶ 34). Blackcloud's deposition testimony on the subject confirms defendants' statement of fact on this issue. (Docket 153, pp. 29-30 & 49-50).

The record is devoid of any evidence defendants acted to deny Mr. Blackcloud access to his attorney as alleged in the amended complaint. Therefore, the court concludes the Pennington County Defendants did not violate Mr. Blackcloud's rights and are granted qualified immunity on this issue. Accordingly, the Pennington County Defendants are entitled to summary judgment on Blackcloud's constitutional and statutory claim he was denied access to counsel.

## II.     DEFENDANT DICK LEIR

On June 1, 2012, Defendant Dick Leir filed a motion for summary judgment. (Docket 117). Mr. Leir asserts he did not act with deliberate indifference toward Mr. Blackcloud's medical needs and he should be granted judgment as a matter of law. (Docket 129 at p. 2). Mr. Blackcloud responded to Mr. Leir's motion for summary judgment on June 25, 2012. (Docket 139). In his response, Mr. Blackcloud takes issue with the use of his deposition testimony, which he claims he never reviewed or signed. (Docket 133). Moreover, Mr. Blackcloud asserts his deposition cannot be relied upon

because it was submitted to the court after the discovery deadline.[15]  Id.

Finally, Mr. Blackcloud asserts Mr. Leir did, in fact, know about his mental

health condition but still delayed treatment.  (Docket 139).  Mr. Blackcloud

goes on to claim Mr. Leir was deliberately indifferent toward his medical

needs because he failed to get him appointments with physicians at the Sioux

San Hospital–a capability Mr. Leir allegedly had via the Mental Health

Committee and its referral process.[16]  Id.  For the reasons set forth below,

defendant Dick Leir's motion for summary judgment is granted.

**1.    Defendant Dick Leir is entitled to summary
judgment on Blackcloud's claim for inadequate
medical care.**

Defendant Leir asserts he did not act with deliberate indifference

toward Mr. Blackcloud's serious medical needs and did not violate the Eighth

Amendment's protection against cruel and unusual punishment.  (Docket

---

[15]As previously noted in footnote 11, Blackcloud's arguments related to
the admissibility of his deposition transcript must fail.

[16]In his response to defendant Leir's motion for summary judgment, it
appears that Blackcloud attempts to bring Behavior Management Systems,
Inc., into the action.  Not only did Blackcloud fail to list Behavior Management
Systems, Inc., in either his original or amended complaint, but the doctrine of
*respondeat superior* does not apply to a § 1983 action, meaning Behavior
Management Systems, Inc., cannot be held individually liable unless it
affirmatively participated or acquiesced in the constitutional violations.  Bell v.
Kansas City Police Dep't, 635 F.3d 346, 347 (8th Cir. 2011).  In his amended
complaint, Blackcloud did not allege that Behavior Management Systems, Inc.,
participated in the alleged constitutional violation.  (Docket 73).  Accordingly,
the court will not consider Blackcloud's new claims against Behavior
Management Systems, Inc.

129). Mr. Leir also asserts that, because Blackcloud has not demonstrated the alleged constitutional violation resulted in actual injury, Mr. Leir is entitled to summary judgment. In his reply, Mr. Blackcloud argues that Mr. Leir was aware of his mental health condition, yet failed to provide appropriate treatment. (Docket 139). Furthermore, Mr. Blackcloud appears to allege that Mr. Leir's indifference to his medical needs is manifested by Mr. Leir's failure to refer Mr. Blackcloud for medical treatment at Sioux San Hospital. Id. Finally, Mr. Blackcloud submits that, as a result of Mr. Leir's deliberate indifference, he suffered mental anguish, loss of weight, headaches, sores, and loss of sleep. Id.

As previously stated, to prevail on an Eighth Amendment claim for "deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs." Coleman, 114 F.3d at 784 (citing Camberos, 73 F.3d at 175). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " Coleman, 114 F.3d at 784 (quoting Camberos, 73 F.3d at 176)). To establish deliberate indifference, an inmate must demonstrate a prison official knew the "inmate face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." Coleman, 114 F.3d at 785 (citing Farmer, 511 U.S. at 847).

Mr. Blackcloud established neither a serious medical need nor deliberate indifference toward that medical need. Not only has Mr. Blackcloud failed to submit any evidence demonstrating he has been diagnosed by a physician with a serious medical condition requiring treatment, see Kayser, 16 F.3d at 281 (noting that a prisoner's bare assertion of a self-diagnosis is insufficient to establish the existence of a serious medical need), but Nurse McClure reviewed Mr. Blackcloud's records and discovered his prescriptions expired in 2009. (Docket 120). The only evidence Mr. Blackcloud provided to demonstrate his objectively serious medical need are his persistent requests for treatment, none of which cite to his actual physical condition.

Mr. Blackcloud also failed to provide evidence to show the alleged delay in treatment adversely affected his medical condition. See Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997) (" 'An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.' " (quoting Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994))). Mr. Blackcloud merely alleged he suffered mental anguish, loss of weight, headaches, sores, and loss of sleep, but he provided no evidence to substantiate these claims. The court finds a reasonable person would not have concluded that his

condition required treatment based on Mr. Blackcloud's requests and the information provided. Mr. Blackcloud failed to establish the existence of a serious medical need.

Even if Mr. Blackcloud's alleged medical needs were objectively serious, he failed to demonstrate Mr. Leir acted with deliberate indifference toward his serious medical needs. Assuming, as Mr. Blackcloud asserts, that Mr. Leir knew about Mr. Blackcloud's medical needs, Mr. Blackcloud has not established Mr. Leir acted with deliberate indifference. As the grievance forms and inmate requests demonstrate, each time Mr. Leir received a request from Mr. Blackcloud, he promptly responded by seeing Mr. Blackcloud and referring his request to the Mental Health Committee. That was the extent of Mr. Leir's responsibilities at PCJ.[17]

Mr. Leir established his position at PCJ during the relevant time period was that of a mental health case worker. (Dockets 132 at ¶ 4; 132-1). As the mental health case worker, Mr. Leir was "responsible for referring [an] inmate's request on to PCJ's mental health medical staff," which was then "responsible for scheduling any appointments for the inmate with the

---

[17]Both parties agree that Leir was not a physician–Leir has a master's degree in social work and was incapable of prescribing medications. (Dockets 139; 132 at ¶ 2).

appropriate providers." Id. at ¶ 5. The specifics of this process varied,[18] but at no point was Mr. Leir responsible for setting up an appointment; at all times, Mr. Leir was to refer cases to either a nurse or the mental health

---

[18]As of June 7, 2010, Dick Leir was to e-mail mental health requests to nurses at PCJ, who would then make a copy of the e-mail, note on the copy why the inmate needed an appointment, and then "place the request in the appointment bin." (Docket 132-2). This is the process Leir followed on June 28, 2010, in response to Blackcloud's June 27, 2010 request, and again on August 23, 2010, in response to Blackcloud's August 23, 2010 request. (Dockets 132 at ¶¶ 7–8; 132-3; 132-4). The Pennington County Sheriff's Office modified the referral process on September 14, 2010:

> 1. Behavior Management employee Dick Leir will continue to receive referrals from inmates, correctional staff and medical staff. Mr. Leir will meet with the inmate and assess their current mental health status and needs. Should an inmate require further assessment or services, Mr. Leir will refer the inmate with the following urgency:
>> a. Referral: No urgency, refer to Mental Health Committee
>> b. Emergent: Inmate should be seen within one week
> 2. Mr. Leir's referrals will be made to jail medical via a mental health referral review form. The form will outline Mr. Leir's observations. Medical staff will add applicable health and medication information. A yellow folder will be created containing the referral form and a four day observation chart. The file will be forwarded to the cellblock for Correctional Officers to notate behavioral observations.
> 3. Supervisors will collect the yellow mental health folders and forward them to the mental health committee.
> 4. The mental health committee will meet each Thursday to review referrals. All information, including staff observations and comments will be considered. The committee may withdraw the inmate's request for mental health services based on the information attained, if deemed appropriate.
> 5. Those referrals deemed appropriate to advance for further assessment and care will be applied to the mental health appointment book, based on urgency and availability.

(Dockets 132 at ¶ 10; 132-6). This is the process Leir followed on October 26, 2010, in response to Blackcloud's October 20, 2010 and October 22, 2012 requests. (Dockets 132 at ¶ 11; 132-7).

medical staff when he believed an appointment might be necessary.[19] (Dockets 132-2; 132-6). As the evidence shows, Mr. Leir fulfilled his responsibilities in a timely fashion. (Dockets 132-3; 132-4; 132-7).

" 'Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.' " Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)). " 'Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.' " Id. (quoting Spruill, 372 F.3d at 236). Because Mr. Leir fulfilled his duties as a mental health case worker, the court will not hold him responsible for failing to secure medical appointments on Mr. Blackcloud's behalf. Further, because the evidence establishes Mr. Leir promptly referred all of Mr. Blackcloud's medical requests to the appropriate medical authorities, the court cannot conclude he acted with deliberate indifference to Mr. Blackcloud's medical needs.

_____

[19]As Leir points out in his reply brief, the fact that his responsibilities were limited to referrals is evidenced by an e-mail from nurse manager Jodie McClure on September 13, 2010, in which she asks PCJ staff, including Leir, to e-mail her the names of inmates who the staff felt needed to be seen for mental health issues. (Dockets 132 at ¶ 9; 132-5). As Leir suggests, this request implies that Leir was not himself capable of scheduling appointments. Furthermore, the fact that Blackcloud's name was already included on McClure's list of patients who might need to be evaluated by mental health professionals demonstrates that medical professionals were aware of Blackcloud's potential needs.

As for Mr. Leir's role on the mental health committee, the court already concluded the committee did not act with deliberate indifference. Rather, as the grievance forms and inmate requests demonstrate, each time Mr. Blackcloud issued a request, the mental health committee reviewed the matter and promptly responded. On various occasions, Mr. Blackcloud was seen by a nurse or a physician, and when medical personnel thought it was necessary, Mr. Blackcloud was prescribed appropriate medications. Therefore, in the absence of a genuine issue of material fact regarding Mr. Blackcloud's access to medical care, the court concludes Mr. Leir did not violated Mr. Blackcloud's constitutional right to adequate medical care. Mr. Leir is entitled to summary judgment on Mr. Blackcloud's Eighth Amendment claim.

## CONCLUSION

Mr. Blackcloud has not established a genuine issue of material fact with regard to his claim defendants denied him access to adequate medical care. Further, Mr. Blackcloud has not established a genuine issue of material fact with regard to his claim the Pennington County Defendants retaliated against him for his participation in the grievance process. Finally, Mr. Blackcloud has not established a genuine issue of material fact with regard to his claim the Pennington County Defendants denied him due process or violated the equal protection clause or denied him access to counsel.

Accordingly, it is hereby

ORDERED that the Pennington County Defendants' motion for summary judgment (Docket 117) is granted as to all claims in plaintiff's amended complaint.

IT IS FURTHER ORDERED that Defendant Dick Leir's motion for summary judgment (Docket 128) is granted as to all claims in plaintiff's amended complaint.

IT IS FURTHER ORDERED that plaintiff's amended complaint is dismissed with prejudice.

Dated March 11, 2013.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE